Filed 10/19/15  In re K.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.B., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.B. et al.,<br><br>        Defendant and Appellant. | E063284<br><br>(Super.Ct.No. J249521)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant J.B.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant K.P.

1

Jean-Rene Basle, County Counsel, Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court terminated the parental rights of K.P. (mother) and J.B. (father) (collectively parents) as to K.B. (minor born November 2010). Mother contends insufficient evidence supports the juvenile court's decision that the beneficial parental relationship and sibling relationship exceptions to termination of parental rights did not apply. Father joins mother's arguments. We affirm.

FACTUAL AND PROCEDURAL HISTORY

On April 15, 2013, San Bernardino County Children and Family Services (CFS) received a report alleging physical abuse and neglect to A.P. (born January 2001), mother's eldest child, who showed up to school with bruising to his legs consistent with being whipped with a belt.[1] On May 16, 2013, CFS received another call and immediate response referral reporting physical abuse and neglect. The reporting party indicated that M.P. (born September 2005), mother's second oldest child, had arrived at school with bruising around both eyes; her forehead; and on the back, left side of her head. School staff indicated they had observed numerous other unexplained injuries over the school year.

---

[1] This appeal is based solely on the juvenile court's termination of parents' parental rights as to K.B.; however, we shall discuss mother's other children where relevant to this case. Father is the biological and presumed father of K.B. only. R.P. is the biological father of A.P. and M.P. and the presumed father of AP., M.P., and B.P. N.C. is the biological father of B.P, but did not receive services.

2

M.P. informed the social worker she had received the injuries as an allergic reaction to latex at the dentist's office stating, "'My mom wanted me to tell you that.'" When asked how she actually received the injuries, M.P. responded, "'Because my mom was slapping me in my face and punching my head.'"[2]

When asked how A.P. received his injuries, M.P. responded, "'He got in trouble at school and got spanked with the belt.'" M.P. stated, "'I get spankings too, but [A.P.] gets harder spankings because he's older and bigger than me.'" M.P. reported minors "are spanked regularly and often times have bruises as a result.'" B.P. confirmed M.P.'s accounts. A.P. admitted to being hit in the head repeatedly by father.

M.P. and B.P. both reported mother and father fought often with raised voices using swear words; they would push and hit one another as well. In a recent fight,

---

[2] Police contacted the doctor's office to which mother had brought M.P. for treatment of the injuries. The physician's assistant whom M.P. saw stated the injuries were the result of an allergic reaction to latex and that she did not "notice any marks or bruises that would indicate to her [M.P.] had been struck or abused by anyone." The investigating officer concluded that "at no time was I led to believe [M.P.] was the victim of [] child abuse at the hands of her mother or anyone else she lives with . . . . My own observations of the mark on [M.P.'s] face led me to believe the origin of the mark was consistent with the physician's findings, that it was only a rash caused by an allergic reaction." The officer found that any suspicion of abuse was unfounded. Moreover, there were allegations by mother and others that M.P. had a tendency to make up stories regarding abuse. Furthermore, the investigating officer noted inconsistencies in the derivations of the injuries reported by M.P. Nonetheless, the social worker asserted that personnel whom she contacted at the medical clinic had done no testing to render the diagnosis of an allergic reaction. Rather, staff had relied upon mother's report of what happened. Likewise, the social worker noted M.P. had been assessed by two separate nurses at her school who both indicated the bruises were not the result of an allergic reaction.

mother had thrown objects at father. A.P. confirmed M.P. and B.P.'s allegations of domestic violence in the home.

Mother had six prior referrals for allegations including general neglect and sexual, emotional, and physical abuse between 2009 and 2013. All were deemed unfounded except the sexual abuse allegation, which was found inconclusive. Father had two prior referrals, one in 2010 and one in 2011; both allegations were for physical abuse that were deemed unfounded. When M.P. was asked how she had sustained injuries in 2012, she responded, "'Mommy hit me like this," and "demonstrated smacking in the face."

Social workers took minors into protective custody and placed M.P., B.P., and K.B. together. A.P. was placed separately due to behavioral problems. On May 22, 2013, the juvenile court detained minors.

In the jurisdiction and disposition report filed June 7, 2013, B.P. was reported as stating she had been "struck with an open hand and belt by" father. She reported father struck K.B. with a belt also. K.B. stated father "used extreme forms of physical discipline resulting in bruising to the child's . . . body." The court found true allegations that mother and father used inappropriate forms of punishment against minor's siblings. The court removed minor from parents' custody and granted them reunification services.

In the status review report filed January 28, 2014, the social worker recommended the court continue parents' reunification services. The social worker noted parents "continue to be engaged in services and have made substantial progress." They "have reported that they have gained an increased knowledge regarding parenting and coping

4

skills and have reported an[] improvement in their relationship and communication." They "seem to have a close attachment to" K.B.

Nonetheless, the social worker also observed, "There have been reports by the children that the mother has instructed them to misbehave in the foster home and it appears as though the mother and [father] are not supportive of the children's placement . . . ." Thus, "Although[] the parents have done well in completing the required services, the undersigned is unable to make a determination regarding the parents' benefit at this time. At this time, there are still concerns regarding the parents' ability to maintain the children's safety and well-being . . . as there have been several referrals alleging abuse that have been received since the last court hearing." "[S]ince the last hearing there have been reports of allegations of abuse that are currently being investigated which present[] with some concerns regarding returning the children at this time."[3]

At a hearing on February 7, 2014, counsel for CFS noted, "There's been some disclosures by . . . [M.P.] of a sexual abuse nature regarding [father], and [father] lives with the mother. So there is a concern about that, so we're just asking that visits—that's being investigated—not be ordered as unsupervised but authority to do so, and we'll continue to assess." The allegations were apparently made on or about January 6, 2014.

At the six-month review hearing on February 26, 2014, the court authorized a Child Assessment Center (CAC) interview of minors and a physical exam of M.P.

---

[3] The social worker neglected to include any details in the report of the further allegations of abuse.

5

Nonetheless, the court noted, "I know based on my experience with the case that reunification is going to occur . . . ." The court ruled parents had made substantial progress on their case plans and there was a substantial probability of return of minors to parents.

A.P.'s counsel noted A.P. "told me he visits three or four times a month with his siblings." Mother's counsel reported, "Mother indicates they all visit together when the parents visit. That's when all the kids visit together." The court ordered sibling visitation four times monthly.

The court ordered visitation between mother and K.B., B.P., and M.P. one time weekly for up to four hours; the social worker was given authority to liberalize visitation. The court ordered visits between father and A.P. once weekly for two hours; the social worker was, again, given authority to liberalize visits. Visits with the female minors were authorized if deemed appropriate after the CAC interviews.

An undated report from CAC indicated minors were seen on February 27, 2014. M.P. indicated that while mother and M.P.'s siblings were out at the store, she was left alone with father. Father came into the living room without underwear on, wiggled his penis at her, and told her to touch it. When M.P. said no, he told her she had to. M.P. repeatedly told father "no"; father eventually told her to go to sleep in her room.

In a report filed on April 4, 2014, the social worker recommended mother continue to receive unsupervised visitation with minors so long as she was ordered not to leave minors alone with father. The social worker additionally requested authority to liberalize

visits up to and including overnight visits when deemed appropriate. On April 10, 2014, counsel for minors B.P., M.P., and K.P. filed an objection to the recommendation of unsupervised and extended visitation. On April 28, 2014, the court barred visitation between father and M.P. and B.P. as detrimental. The court initially indicated it would order visitation between father and K.B., but the visits would need to be supervised by someone other than mother. Nevertheless, the court actually ordered unsupervised visitation between both parents and K.B. The court ordered unsupervised visitation between all minors and mother.

In a status review report filed August 15, 2014, the social worker recommended the court return K.B. and A.P. to parents' custody under family maintenance services. K.B. and A.P. had expressed their desire to return home. She recommended B.P. and M.P. be "returned" to R.P.[4] At the next hearing on August 26, 2014, counsel for K.B. objected to return of K.B. to parents due to the allegations of sexual abuse by father against M.P.

In a CAC interview filed on September 8, 2014, B.P. reported that father, while naked, grabbed her hair, pulled her into a room, got on top of her, and began to place his penis in her mouth. She resisted, moving her head from side to side. Father placed his hands around B.P.'s neck. Father's sister then walked in and told father to get away from B.P. Mother was outside smoking while the incident occurred. B.P. initially reported the incident on May 19, 2014.

---

[4] It actually appears R.P. had never had prior custody of either minor.

7

In the police report, father admitted being at a home where minors stopped with mother in order that mother's friend could take care of an emergency. Mother's friend denied father even saw minors. Father also denied seeing any of the minors. Father offered to take a polygraph examination.

During the polygraph examination, father admitted seeing B.P. and giving her a hug that day. After initially denying he called B.P. a "brat," father admitted to doing so. Father later admitted to pulling B.P.'s hair too hard, forcing her to the ground. Father then stated he bent over the victim to give her a hug in which position his crotch was in her face. He remembered pulling up his pants as "they were falling down." However, his penis never came out, nor did he try to place it in B.P.'s mouth.

In an "Information to the Court" filed September 8, 2014, the social worker conveyed the contents of the police report and father's polygraph examination. The social worker recommended, with respect to K.B., terminating reunification services for father and returning K.B. to mother with family maintenance services when appropriate.

At a hearing on September 8, 2014, it was noted mother had been visiting with M.P. and B.P. once monthly for four hours. Counsel for minors asked that future visits be supervised as M.P. and B.P. were afraid of mother and uneasy about visits. The court ordered visits supervised. Father was reported to be moving out of mother's home. In a report filed September 24, 2014, the social worker recommend parents' reunification services as to M.P. and B.P. be terminated. She recommended continued services for parents as to K.B. and A.P.

8

At the 12-month review hearing on September 24, 2014, the juvenile court indicated it would dismiss the case as to B.P. and M.P. with family law orders granting mother and R.P. joint legal custody and R.P. primary legal custody. The juvenile court terminated parents' reunification services as to M.P. and B.P., but continued services as to K.B. and A.P. The court authorized extended visits including unsupervised overnight and weekend visitation upon execution of an approval packet.

In a status review hearing report filed November 21, 2014, the social worker recommended A.P. remain in mother's home with family maintenance services while parent's reunification services as to K.B. be terminated. The social worker noted parents "are still involved despite their claims that they have separated. On September 23, 2014, the undersigned visited the home unannounced for a second attempt where [mother] allowed the undersigned to view the home, where there were no visible indicators that [father] was living in the home. On November 18, 2014, the undersigned visited the home unannounced where [father] was not initially visible in the home." "The undersigned later found [father] in the mother's bedroom closet when the mother was asked to view the content of the room."

The social worker noted parents had visited consistently with K.B. with no issues. K.B. had resided in her current foster home since July 23, 2013.

The social worker further noted, "The therapist reported . . . that [mother] appeared to not take responsibility for the circumstances surrounding the children's removal from her care and seem[ed] [in] denial. The therapist also reported that [mother]

9

seemed to not have a connection [*sic*] in regards to feelings about the children's initial removal. The therapist noted that she had concerns regarding the mother's ability to protect [K.B.] if returned to her care . . . ." Mother's therapist concluded "it does not appear it would benefit the best interest of [mother's] children to be returned home."

Father's therapist noted father denies any prior physical discipline as well as any inappropriate sexual behavior. The therapist also noted "that [father] has plans to resume his relationship with mother." The social worker concluded, "At this time, there appears to be continued risk of detriment to [K.B's] physical and/or emotional well being as the mother . . . has not been able to demonstrate her ability to protect the child from harm despite previous sexual and physical abuse allegations against the father. . . . Although the parents have engaged in services and were able to complete the components, it appears as though [parents] may lack substantial benefit from these services."

At the 18-month review hearing on November 24, 2014, mother testified she had engaged in six sessions with a licensed counselor; she had two left to complete counseling. She testified she was no longer with father. Father had come to her house three to four times to talk with A.P. as A.P. was having a hard time in school and refused to talk about with anyone except father.[5] Mother also said father was at her house when the social worker arrived in order to pick something up and "freaked out" and "hid in my closet."

---

[5] At the hearing on September 15, 2014, A.P. himself informed the court he did not want father in the house.

10

Mother said she visits with minor every chance she gets, twice a week for four hours total, only having missed once when she was sick. Initially during visitation K.B. is "abrasive or hostile because she doesn't understand what's going on. After a while, 20 minutes, she is totally warmed up and a goof ball . . . ." Mother acknowledged inappropriate physical discipline, such as soft spanking by both parents, but denied any sexual abuse.

Father testified he was at mother's house to talk with A.P. and pick up a few things. When the social worker arrived he "freaked out" and hid. He lived with his stepfather since he was told he had to move of mother's home two months earlier. Father goes over to mother's home to speak with A.P. for an hour or two and then leaves. Father acknowledged spanking minors, which he now believes to be inappropriate, but denied any sexual abuse.

Father testified he was lying to police when he told them he engaged in some sort of physical activity with B.P. in which he grabbed her, pulled her hair, and caused her to fall backward. He only said those things because the officer wanted him to say them. Father never actually saw B.P. that day.

The juvenile court denied parents reunification services as to K.B. Parents filed notices of intent to file writ petitions on November 24, and December 1, 2014. Counsel for both parents later filed letters indicating they would not be filing writs. We dismissed mother's and father's writ cases on December 31, 2014, and January 7, 2015, respectively.

11

On March 13, 2015, the social worker filed the Welfare and Institutions Code section 366.26[6] report in which she recommended parents' parental rights as to K.B. be terminated. The social worker noted K.B. "misses her siblings and knows that her family has deteriorated since the children's removal from their mother's home. Her reaction of sadness is appropriate under the circumstances and is not a cause for concern. [K.P.] doesn't stay sad for long . . . ." K.B. lived with her half siblings with whom she shares "common experiences and emotional bonds. [K.B.] continues to have telephone calls, Skype visits[,] and face to face visits with her two [] half sisters . . . who now live with their father in Northern California." She has occasional visits with A.P. who lives with mother. K.B. "receives visits from her siblings when her parents have visitations, or when her sisters are in town. Her last visit with [M.P.] and [B.P.] was on March 7, 2015."

The social worker observed that, "From the beginning of this case, the parents . . . have visited the child . . . consistently, rarely missing a visit and informing ahead of time if reschedule is needed. Initial visits by the parents were done together, but are now separate, and there are no issues reported regarding how the visits go."

The social worker further noted K.B.'s current placement "is very stable and the foster mother wishes to adopt the child." K.B. developed emotional attachments to the prospective adoptive parent who has been her primary caregiver for nearly half her life.

_____

[6] All further statutory references are to the Welfare and Institutions Code.

The prospective adoptive parent "cares deeply for [K.B.] and demonstrates a willingness and ability to care for her permanently. [The prospective adoptive parent] has expressed a desire to adopt [K.B.] and provide for her well-being on a permanent basis."

At the section 366.26 hearing, mother testified A.P. had never lived with K.B. Mother had not missed any visits. K.B. calls her "'mommy,'" shows affection by hugging and kissing her, tells her she loves her, and says she misses her at the beginnings of visits. Minor calls the prospective adoptive parent by her first name or "'Pretend Mommy'" or "'Mommy.'" Mother believed she was bonded with K.B. and severance of that bond would be detrimental to K.B. Mother testified K.B. calls father "'daddy.'" Mother is, "Um, kind of'" still in a relationship with father.

A.P. attends visits with K.B. as his school schedule permits, at least once a month. A.P. calls K.B. "'Big Bear.'" She hugs and kisses him and tells him she loves him. The prospective adoptive parent recently had an overnight visit for the children.

The juvenile court found parents had engaged in regular visitation and contact with K.B. The court exposited, "The child does have a relationship with both Mother and Father, but the benefit to the child of maintaining that relationship has to outweigh benefits of adoption, and I would have to find there is detriment or the child would be greatly harmed by termination of parental rights. The evidence does not substantiate that high burden. Although the contact with [] parents and [K.B.] have, I am sure has been some benefit to the minor, [] she is in a stable, concurrent planning home. The prospective adoptive parent [has] had her for almost two years . . . ."

13

The court further noted, "So both parents, although maintaining regular visitation, they have been friendly visitors. They have not taken care of the day-to-day needs of [K.B.] for a significant amount of time, almost two years." The court found parents had failed to meet their burden that the beneficial parent child exception to termination of parental rights applied. Thus, the court terminated parents' parental rights as to K.B.

DISCUSSION

A.     Beneficial Parental Relationship Exception

Mother argues insufficient evidence supports the juvenile court's determination the beneficial parental relationship exception did not apply to termination of her parental rights. Father joins the argument to the extent reversal will also reverse termination of his own parental rights. We disagree.

Once reunification services have been terminated and a child has been found adoptable, "adoption should be ordered unless exceptional circumstances exist." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) Under section 366.26, subdivision (c)(1)(B)(i), one such exception exists where, "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." A beneficial relationship is established if it "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The parent has the burden of proving

14

termination would be detrimental to the child. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; *In re Jerome D*. (2000) 84 Cal.App.4th 1200, 1207.)

"'[T]he court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

"[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350; accord, *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) "We determine whether there is substantial evidence to support the trial court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] If the court's ruling is supported by substantial evidence, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights . . . ." (*In re S.B.* (2008) 164 Cal.App.4th 289, 297-298.)

Here, there is scant evidence in the record regarding the type of bond between K.B. and mother. Although the reports and testimony establish mother regularly and consistently visited with minor, there is little to support mother's burden of establishing there was a bond and, if so, how strong that bond was. Indeed, mother herself testified

15

K.B. was initially "abrasive or hostile" during visitation. Minor was two and half years old when removed from mother's custody. She had been placed with the current prospective adoptive parent on July 23, 2013, where she had resided for nearly two years when mother's parental rights were terminated. Minor was now in a stable, permanent placement with someone whom she had established an emotional bond. Substantial evidence supported the juvenile court's ruling.

Contrary to mother's contention, the juvenile court did not err in characterizing parents as "friendly visitors." Ultimately, such a characterization was well within the court's discretion and nothing in the record establishes there was any more serious degree of bond between parents and K.B. Simply because parents raised K.B. for two and a half years did not establish the requisite degree of bond two years after K.B. had been removed from their custody to justify an exception to the presumption in favor of adoption.

Mother accurately describes the law as not requiring what the juvenile court described as "day-to-day" care for a child in order to apply the beneficial parent relationship exception. (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555, fn. 5 ["'Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction.'"].) However, as discussed *ante*, regardless of whether parents had day-to-day interaction with minor, there is insufficient

16

evidence of the degree of a bond necessary to outweigh minor's need for a safe and stable placement. Moreover, minor was not an older child. Sufficient evidence supports the juvenile court's findings and orders.

B.     Sibling Relationship Exception.

Mother contends the juvenile court erred in not applying the sibling relationship exception to termination of parental rights. Father joins her argument. CFS argues mother forfeited the argument by failing to raise it below. We disagree with CFS that mother forfeited the issue. However, we hold substantial evidence supported the court's ruling.

The juvenile court has no sua sponte duty to raise the applicability of the sibling relationship exception when not raised by parents. Where parents failed to raise the issue below, they have forfeited the issue on appeal. (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 291-292.) Although we have discretion to address the issue where not raised below, "a determination concerning the sibling relationship exception raises factual questions that are unsuitable for resolution on appeal." (*Id*. at p. 292.)

Here, counsel for mother argued at the section 366.26 hearing that, "In addition to the parental bond, the mother also testified she believes there is a bond between [K.B.] and[,] at least, [A.P.], who is in the mother's care, and that does not discount the relationship between [M.P.] and [B.P.] We believe there is a bond there." This was sufficient to preserve the argument for appeal.

17

The sibling relationship exception applies if the court finds a compelling reason for determining that termination would be detrimental to the child due to a "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."  (§ 366.26, subd. (c)(1)(B)(v).)

"Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption.  It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' [Citation.]  Indeed, even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption.  [Citation.]"  (*In re Celine R.* (2003) 31 Cal.4th 45, 61.)  Parents have the burden of establishing the applicability of the exception.  (See *In re Megan S.* (2002) 104 Cal.App.4th 247, 252.)  The juvenile court may properly consider evidence that the prospective adoptive parents intend to maintain contact between minor and the siblings

18

and, thus, that adoption would not interfere with the sibling relationship. (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 292.)

In reviewing challenges to a trial court's decision as to the applicability of these exceptions, we will employ the substantial evidence or abuse of discretion standards of review depending on the nature of the challenge. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316.) We will apply the substantial evidence standard of review to evaluate the evidentiary showing with respect to factual issues, such as whether the child has a close and strong bond with a sibling (for the sibling relationship exception). (*Id.* at p. 1315; § 366.26, subd. (c)(1)(B)(i), (v).) However, a challenge to the trial court's determination of questions such as whether, given the existence of a sibling relationship, there is a compelling reason for determining that termination of parental rights would be detrimental to the child "is a quintessentially discretionary determination." (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) We review such decisions for abuse of discretion. In the dependency context, both standards call for a high degree of appellate court deference. (*Ibid.*; *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.)

Here, the social worker noted K.B. missed her siblings, but concluded that her sadness was appropriate under the circumstances and was not a cause for concern as she did not stay sad for long. K.B. continued to have telephone calls, Skype visits, and face-to-face visits with B.P. and M.P. She had occasional visits with A.P., with whom mother testified K.B. had never lived. Minor also received visits from her sisters when they were

19

in town.  Her last visit with M.P. and B.P. was on March 7, 2015.  The prospective adoptive parent had arranged an overnight visit for the children.

As noted above, minor was now in a stable, permanent placement with someone whom she had established an emotional bond.  There is no indication in the record that any interference with her sibling relationship would prove detrimental to minor.  Moreover, the evidence sufficiently establishes minor would benefit more from living in a permanent adoptive home than she would suffer from any interference with her sibling relationships.  Finally, the prospective adoptive parent appears to have encouraged visitation allowing telephonic, Skype, and in-person visits, extending even to an overnight visit.  Thus, substantial evidence supports the juvenile court's implied finding the sibling relationship exception did not apply.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING

J.

We concur:

McKINSTER
           Acting P. J.

MILLER
           J.